Brinkerhoff, J.
As the facts on which each of these cases depends are, to a great extent, the same in both, and involving as-they do, more or less, the rights and interests of the same parties, by request of counsel they have been argued and considered together. They are relics of antiquity, the litigation having begun, in May, 1851, now nearly nineteen years ago. During that time, the death of parties, the doings of their heirs and personal representatives, the transfer of interests, the intervention of now parties, the references, reports, motions, rulings, decrees, and exceptions in the lower courts, have, altogether, made the history of the cases so complicated and multifarious, that anything approaching a full detail of them would render a report of the eases, from their unendurable todiousness, worthless to the profession. For this reason — - although we have listened patiently to the exhaustive and somewhat exhausting arguments of counsel, and have endeavored to give oven to the minutest points arising in each of the cases the consideration and weight to which they seemed to be entitled — I think it best to state such facts only and so far as to present the-dominant questions of law on which the cases depend.
In June, 1841, Francis Barclay, being the owner of the north half of lot 42 in Youngstown, mortgaged it to the State of Ohio to. secure to the commissioners of the surplus revenue fund of Trumbull county the payment of a loan by them to him of $2,000, with interest.
Afterward, in December, 1845, a decree was obtained by the fund commissioners for the foreclosure of the mortgage and a sale of the promises; the amount due being $2,775. This was then the only lien on the premises.
548] *This decree remaining in full force, unsatisfied, and no-steps having been taken to enforce a sale under it, afterward, in October, 1850, Francis Barclay executed to William Porter a deed of conveyance, absolute in its terms, of the premises above mentioned.
Still afterward, May, 1851, the complainants, Wood & Oliver, being judgment creditors of Francis Barclay, but whose judgment-was subsequent in date to the transactions above related, filed their creditor’s bill, charging that the conveyance above mentioned to William Porter, though absolute on its face, was in fact but a mortgage to secure a debt due by Francis Barclay to one Colwell Porter-in his lifetime, of whose estate, the ostensible vendee, William *549 Porter, was administrator, and that the remaining interest therein was held in secret and fraudulent trust by the ostensibly absolute vendee, William Porter, for the benefit of their judgment debtor, Barclay; praying that the promises might be sold, and that the -.said remaining interest therein, so held in secret and fraudulent .trust, might be appropriated to the payment of their judgment.
Now, while this bill of Wood & Oliver, contesting the bona fides .and validity of the conveyance from Barclay to William Porter, •was pending, the old decree of foreclosure and sale in favor of the fund commissioners remained in full force and unsatisfied, and it. being, without question from any quarter, the first lien upon the promises ; and so, afterward, in November, 1853, the premises were sold under this decree at public sale to William Porter; the sale was duly confirmed by the court, a deed of conveyance to him was ordered, and the same was executed by the proper officer, and placed on record. And from this time forth, it will be seen, William Porter held title to the premises in question, not under the ■conveyance from Francis Barclay to him, but under the purchase by him, and the conveyance to him, under the decree in favor of the fund commissioners, based upon a mortgage prior in date to Barclay’s first conveyance to him, prior in date to the judgment of Wood & Oliver, prior in date to the filing of their creditor’s bill, .and so, by reason of the priority of its origin, overriding and displacing any and all +other claims, liens, and titles subse- [549 quently derived from or through Francis Barclay.
Such being, then, the character of William Porter’s title to the promises, he afterward (May 11, 1857) borrowed from Scott and Taggart, as executors of one Forbes, the sum of one thousand seven hundred and forty dollars; and to secure the repayment of that loan gave them a mortgage on the premises, which was at once recorded.
The loan secured by this mortgage being unpaid when due, Scott .and Taggart instituted proceedings thereon for foreclosure arid sale, and in October, 1860, obtained the decree they sought.
Meanwhile the case' of Wood & Oliver against William Porter, Francis Barclay, and others, contesting the bona fides of Barclay’s ■conveyance to Porter, and seeking to establish a secret trust in Porter for the benefit of their debtor, Barclay, had gone on independently, and without reference to the lien of Scott and Taggart, .under the mortgage to them and their decree thereon; and finally, in April, 1863, they obtained a decree for the sale of the premises *550 and the application of the proceeds of the sale to the payment of their judgment against Barclay. Under this decree the promises were sold; but the proceeds of the sale not having yet been distributed or applied, Scott and Taggart came in, and on application to the court were made parties in the case of Wood & Oliver, and' claimed that the proceeds of the sale of the premises should be first applied to the payment of their decree, rendered upon the mortgage-to them.
The court below held that the decree of Scott and Taggart was-entitled to be first paid out of the proceeds of the sale, and so ordered; and it is now alleged that the court below erred: 1. In permitting Scott and Taggart to be made parties in the case of Wood. & Oliver against Barclay and others; and, 2. In ordering, that out. of the proceeds of the sale of the premises in question, Scott and Taggart should be first paid.
We are unable to see any error in permitting Scott and Taggart to come in and be made parties; it jeoparded the just rights of no-550] one; and it tended to prevent a multiplicity *of subsequent suits, and to hasten the termination of an already sufficiently complicated and protracted litigation: and so was good practice, and in accordance with the policy of the law.
We are also well satisfied that there was no error in ordering that the decree of Scott and Taggart should be first paid. It is. claimed by counsel, however, that there was error in this holding, because, they say, the mortgage of Scott and Taggart was taken pendente lite (pending the suit of Wood & Oliver), and that this Uspendens precluded the acquisition of title to the premises in controversy in that suit, by mortgage or otherwise. Now, it is very true-that while property is the subject-matter of a pending litigation,, outside parties are bound to take notice of the rights and claims of parties to such litigation; arid hence, if the validity of the mortgage of the fund commissioners, their decree based upon it, or their sale under that decree, had been drawn in question in the suit of Wood & Oliver at the time Scott and Taggart took their mortgage,, they would have taken it at their peril. But such was not the case. Neither the validity of the mortgage of the fund commissioners nor its priority over all other liens was ever questioned, nor is it now; nor, up to that time, was it alleged, by supplemental bill or otherwise, that Barclay furnished the means by which Porter purchased the land under the decree of the fund commissioners, or'held the- *551 title in trust for him.. The suit of Wood & Oliver simply attacked the title of William Porter to the premises as derived by him through the private conveyance to him by Barclay, and did not and could not have any reference to, or any effect upon, a new and independent, title of Porter or any one else derived from a sale under a prior and', superior lien. The sale under the decree of the fund commissioners was regular, and was confirmed by the court. It was a judicial sale; and all the world, including Wood & Oliver, and Porter also, were at liberty to compete for the purchase of the premises; and when Porter bought them at that sale they became his, to do what he pleased with; and Wood & Oliver, if they had rights as against Barclay, or as against Porter as the trustee of Barclay, were remitted to the surplus proceeds, if any, arising *from the sale [551 of the premises, after satisfying the decree in favor of the fund commissioners. They could have no further claim upon the land; and the doctrine of lis pendens, wo think, has no application to a caso of this kind.
Having thus disposed of this question, I now go back to another branch of these cases, which, in order to avoid complication and consequent obscurity of statement, I have hitherto left unnoticed.
In 1847, Barclay, being then evidently in embarrassed circumstances, conveyed what in these proceedings is known as his homestead lot to a Mrs. Broaden, the wife of his (Barclay’s) partner in business. In 1849, Mrs. Breaden, joining with her husband, conveyed the same to one Percival, who was the brother-in-law of Barclay and wife; and he, in 1854, conveyed the same to Barclay’s wife. Wood & Oliver, in their creditors’ bill, filed in 1851, while the title to the homestead lot was ostensibly in Percival, who was made a party defendant therein, averred that these sales wore fraudulent as against them, and sought to set them aside, and to have the lot sold and the proceeds of the sale applied to the payment of their judgment. The court below found and decreed in accordance with the allegations and prayer of Wood & Oliver in this behalf. It is now claimed that such finding is not sustained by the evidence.
To set out here and discuss the evidence bearing on this question of fact, would be labor for us without profit to any one; and so 1 content myself with saying that we have examined the evidence, and we coincide in opinion with the different masters to whom this question has been referred in the course of the litigation, and with *552 the courts below, in holding that the conveyances of the homestead lot from Barclay to Mrs. Broaden, from her to Percival, and from him to Mrs. Barclay, were fraudulent and void.
Decrees will be entered in accordance with these rulings.
Day, C. J., and Scott, Welch, and White, JJ., concurred.